IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:13-CV-370-FL

| | |
|---|---|
| ALBER TYRONE TREADWELL | ) |
| | ) |
| Plaintiff/Claimant, | ) |
| | ) |
| | ) **MEMORANDUM AND** |
| v. | ) **RECOMMENDATION** |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE-22, DE-27] pursuant to Fed. R. Civ. P. 12(c). Claimant Alber Tyrone Treadwell ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of his applications for a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") payments. The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, this court recommends denying Claimant's Motion for Judgment on the Pleadings, granting Defendant's Motion for Judgment on the Pleadings and upholding the final decision of the Commissioner.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability, DIB, and SSI on August 27, 2009, alleging disability beginning December 15, 2008. (R. 18, 168-179). Both claims were denied initially and upon reconsideration. (R. 18, 94-98, 100-08). A hearing before Administrative Law Judge Edward Bowling ("the ALJ") was held on February 2, 2012, at which Claimant was

represented by a non-attorney representative and a vocational expert ("VE") appeared and testified. (R. 41-89). On March 1, 2012, the ALJ issued a decision denying Claimant's request for benefits. (R. 15-29). On February 25, 2013, the Appeals Council denied Claimant's request for review. (R. 4-9). Claimant then filed a complaint in this court seeking review of the now final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

2

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. §§ 404.1520, 416.920 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 474 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. §§ 404.1520a(b)-(c) and 416.920a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* §§ 404.1520a(e)(3), 416.920a(e)(3).

In this case, Claimant alleges the following errors by the ALJ: (1) failure to discuss all of Claimant's alleged impairments, Pl.'s Mem. Supp. Pl.'s Mot. J. Pleadings ("Pl.'s Mem.") at 1-2; (2) failure to discuss specific pieces of evidence, *id.* at 2-6; (3) improperly considering Claimant's

failure to adhere to the recommended course of treatment where he had an excuse for being noncompliant, *id.* at 2; (4) failure to fully consider statements made by a third-party witness, *id.* at 4; (5) improper consideration of pre-onset effects of Claimant's obesity, *id.* at 5; (6) improper consideration of medical opinion evidence, *id.* at 5-6; (7) failure to account for Claimant's medication side effects when making the credibility determination, *id.* at 6; and (8) improper reliance on VE testimony, *id.*

## IV. FACTUAL HISTORY

### A. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found that Claimant was no longer engaged in substantial gainful employment. (R. 20). Next, the ALJ determined that Claimant had the following severe impairments: degenerative disc disease of the lumbar and thoracic spine; depression/bipolar disorder; anxiety/post-traumatic stress disorder ("PTSD"); personality disorder; obesity; asthma; and degenerative joint disease of the bilateral knees. *Id.* The ALJ determined that Claimant did not suffer from any non-severe impairments. *See id.* At step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 21-22). Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in mild restrictions in his activities of daily living, moderate difficulties in social functioning and concentration, persistence and pace, with no episodes of decompensation of an extended duration. (R. 21).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the

4

ability to perform sedentary work[1] with the following additional limitations:

> [Claimant] can occasionally carry 20 pounds; frequently carry 10 pounds; sit up to six hours in an eight-hour day; and stand and/or walk two hours in an eight-hour day. [Claimant] can occasionally use foot controls with the bilateral lower extremities; occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally balance and stoop; frequently kneel; and never crawl. He should avoid extremes of cold or heat; avoid concentrated exposure to fumes, odors, dust, and gases; and avoid concentrated exposure to hazards.

(R. 22). The ALJ also identified the following non-exertional limitations: simple, routine, and repetitive tasks; apply common sense and understanding to carry out oral, written, and diagrammatic instructions; non-production pace work; and frequent, but not constant, contact with the public. (R. 22-23). In making this assessment, the ALJ found Claimant's statements about his limitations not fully credible. (R. 23-27). At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of his past relevant work as an insurance checker and a customer service representative. (R. 27). Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 28).

## B. Claimant's Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing, Claimant was 40 years old and unemployed. (R. 52, 175). Claimant attained an 11th grade education, finishing a few credits shy of graduating from high school. (R. 48-49). Claimant was last employed with AT&T Mobility as

---

[1] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. §§ 404.1567(a), 416.967(a); S.S.R. 96-9p, 1996 SSR LEXIS 6, at *8, 1996 WL 374185, at *3. "Occasionally" generally totals no more than about 2 hours of an 8-hour workday. "Sitting" generally totals about 6 hours of an 8-hour workday. S.S.R. 96-9p, 1996 SSR LEXIS 6, at *8-9, 1996 WL 374185, at *3. A full range of sedentary work includes all or substantially all of the approximately 200 unskilled sedentary occupations administratively noticed in 20 C.F.R. § 404, Subpt. P, App. 2, Table 1. *Id.*

5

a customer service representative, where he worked for approximately three (3) years. (R. 52-53). Claimant's past work experience also includes work as an insurance agent/salesman. (R. 53-54).

Claimant explained numerous medical conditions support his disability claim and his inability to work full-time. These medical conditions include chronic back pain, (R. 56-58, 80-81), sleep apnea (R. 58-59), sarcoidosis (R. 59-63, 81), knee pain (R. 63-65), anxiety (R. 65-66), depression (R. 66-67), and PTSD (R. 67-69). Claimant also described a number of side effects from his medications. (R. 69-72).

Claimant testified that he is unable to work due to chronic back pain. (R. 56-58). Claimant described excruciating back pain on a daily basis – on good days, the pain would be an eight (8) out of ten (10), while on bad days, it would be a full ten (10) out of ten (10). (R. 56). Claimant testified that the pain affects his ability to focus and concentrate. (R. 56-57). He also noted that since 2008, the pain has worsened. (R. 57). Claimant stated that the pain makes walking difficult and wakes him from sleeping five (5) out of every seven (7) nights. (R. 57-58). Claimant noted that since being prescribed Flexeril, the pain level has been reduced to around a five (5) out of ten (10) when under the influence of medication. (R. 57). Claimant has not undergone any back surgery but did note that one doctor recommended it. (R. 80-81).

Claimant also described problems with sleep apnea. (R. 58-59). Despite being prescribed a CPAP machine in 2006, and continuing to use one through the present, Claimant continues to experience difficulty sleeping on a nightly basis. *Id.* Claimant testified that effects such as humidity and cold weather exacerbate the shortness of breath he experiences as a result of the condition. (R. 59).

Claimant described problems with sarcoidosis. (R. 59-63). One of the major effects of the

6

disease is that Claimant's feet and joints swell and become painful. (R. 59-60). The swelling and pain began most prominently in 2008. (R. 59). When Claimant's feet swell, an everyday occurrence, walking is extremely difficult and painful. (R. 60). As a result of the condition, Claimant's pain is so severe that he cannot tie or lace up shoes. (R. 60-61). Claimant's ankles swell up at times as well, and make walking even more difficult. (R. 61). To combat these symptoms, Claimant began regularly elevating his feet in 2010. (R. 62). For such treatment to be effective, Claimant generally must elevate his feet for five hours during a typical working day. (R. 62-63). Claimant underwent some inhaling treatment in the past, but once he lost his job he was unable to continue with the treatment. (R. 81).

Claimant also noted knee pain that dates back to an injury incurred while playing high school football. (R. 63-65). The injury causes Claimant's knee to lock up occasionally and prevents him from experiencing a full range of motion in his left knee. (R. 63-64). Claimant's physical therapist prescribed him a cane to assist him while ambulating. (R. 64). Claimant testified that the cane helps brace him when standing up or when the pain in his knee becomes so intense that it makes him prone to falling. (R. 64-65). Claimant never walks without the assistance of his cane. (R. 65).

Claimant also testified to experiencing troubles with anxiety disorder, depression, and PTSD. (R. 65-69). Claimant has experienced problems with anxiety since 2007. (R. 65). Claimant identifies the trigger of his problems as the workload and demands of his job along with increased symptoms from his other health problems. (R. 66). The symptoms of anxiety were shortness of breath, chest tightness, and lower leg pain. *Id.* Claimant noted that the primary symptom of his depression is the affect on his ability to concentrate and to remember appointments and other tasks. (R. 66-67). Claimant experiences problems with PTSD dating back to an incident in 2008 where

7

he saw someone shot to death in his front yard (R. 67). Claimant struggles to go out in public and to feel comfortable while in crowds of more than five (5) people as a result of the shooting. (R. 68). Claimant testified that every time he leaves the house, he hears voices threatening to kill him, and he now estimates that he stays inside roughly 90 percent of the time. (R. 68-69). Prior to the incident, Claimant had been an extroverted person who was active in church. (R. 69).

Claimant also described some side effects from the medications he takes in order to combat the symptoms of his various ailments. (R. 69-72). He attributed gaining 80 pounds to medications causing increased appetite and the requirement that some medications be taken with food. (R. 69-70). Abilify, which Claimant takes to combat depression, causes nausea and dry mouth. (R. 71). Depakote caused Claimant increased shortness of breath, so the schedule was changed in order to avoid conflicts with Claimant's other ailments. (R. 71-72). Valium, prescribed to help Claimant's anxiety, makes Claimant drowsy but is generally taken at night in order to help Claimant sleep. (R. 72).

Claimant described some functional limitations as a result of his varied ailments. Claimant retains the ability to drive occasionally. (R. 48). He is unable to do any cooking, laundry, or vacuuming, despite having been able to perform these activities prior to the onset of his ailments. (R. 73). Claimant is able to shop for groceries with the assistance of a nurse/missionary who visits him in his home, though he does require the assistance of a motorized shopping cart. (R. 73-74). Claimant estimates that he leaves his home about once every two weeks. (R. 74). Claimant noted that prior to the onset of his symptoms, he would go out with friends and hike but that he is prevented from doing so now. (R. 78). Claimant does not think that in his condition he could perform his old jobs, estimates that he could lift and carry ten (10) pounds at most, could sit for

8

about 30 minutes during an eight-hour workday, and could walk at most 300 feet without rest. (R. 74-76). Claimant cannot tolerate fumes, humidity, or smoke, cannot stoop, crouch, or crawl, and does not tolerate crowds well. (R. 76-77).

## C.    Vocational Expert's Testimony at the Administrative Hearing

Coraetta Harrelson testified as a VE at the administrative hearing. (R. 83-87). After the VE's testimony regarding Claimant's past work experience (R. 83), the ALJ asked the VE to assume a hypothetical individual of the same age, education and prior work experience as Claimant and posed two (2) hypothetical questions. First, the ALJ asked whether the individual could perform Claimant's past relevant work as an insurance checker (DOT # 219.482-014) or customer service representative (DOT # 239.227-010) assuming the individual has the physical capacity to:

occasionally carry 20 pounds, frequently 10. Sit, stand, and/or walk two hours in an eight-hour day, which would basically incorporate a sit/stand option. So, I'm not going to also incorporate a sit/stand option. Would sit up to six hours in an eight-hour day. Occasional use of foot controls bilaterally with the lower extremities. Occasionally climb ramps and stairs – never ladders, ropes, and scaffolds. I'm varying at this point – occasional balancing and stooping. Frequent kneeling. And never crawling. This individual would also have to avoid extreme variances of cold or heat. Not [sic] extreme variances. Would have to avoid extremes of cold or heat. This individual had to avoid concentrated exposures to fumes, odors, dust, and gases. And would have to avoid concentrated exposures to hazards. As the result of the side effects of medication, pain, or mental disorders, this individual would be limited to simple, routine, repetitive tasks.    And that they could apply common-sense understanding to carry out oral, written, and diagrammatic instructions. They would have to have only frequent, not constant, contact with the public. Could get along okay with co-workers. This individual would have to have a low-stress-type job. And by that I mean he would have to have a job that would not require production such as you would find. . .in an assembly line-type position. Stressors of normal work day would not be a problem. [The]. . .hypothetical person could adapt to normal work changes.

(R. 84-85). The VE responded that the hypothetical individual would not be able to perform Claimant's past relevant work. (R. 85). The ALJ then asked whether there were any jobs available

9

in the local and national economies to an individual with the limitations described. *Id.* The VE responded, when limited only to jobs available at the sedentary level, that work would be available to an individual with the limitations and gave the following examples: telephone information clerk (DOT # 237.367-046), lens inserter (DOT # 713.687-026), and plastic design applier (DOT # 690.686-046). (R. 86). The ALJ then asked whether the same individual could find work assuming the following added restrictions: the individual would miss two or more days of work per month as a result of physical problems or pain; the individual would be unable to focus to the extent that they would be off-task more than 20 percent of the time; and that the individual would have to lie down for up to one third of the work day. (R. 86-87). The VE responded that such an individual could not maintain competitive employment at any exertional level. (R. 87).

## V. DISCUSSION

### A. The ALJ's Failure to Discuss All of Claimant's Alleged Impairments.

Claimant contends first that the ALJ erred in failing to discuss all of his alleged impairments. Pl.'s Mem. at 1-2. Specifically, Claimant argues that the ALJ failed to fully discuss Claimant's bipolar disorder. *Id.* at 2. This court disagrees with Claimant and finds that the ALJ adequately discussed all of Claimant's impairments.

Contrary to Claimant's assertion, the ALJ addressed bipolar disorder in multiple places throughout his decision. First, the ALJ recognized that Claimant's bipolar disorder constituted a severe impairment because it resulted in "functional limitations or restrictions that have more than a minimal effect on [his] ability to perform basic work activities." (R. 20). Next, the ALJ evaluated whether Claimant's bipolar disorder met or medically equaled one the listed impairments. (R. 21-22). In concluding that it did not, the ALJ determined that neither the paragraph B nor C criteria

10

were met. *Id.* Thus, the ALJ reviewed whether Claimant suffered restrictions in activities of daily living, social functioning, concentration, persistence, and pace, and whether Claimant suffered any extended-duration episodes of decompensation as a result of his bipolar disorder. (R. 21). Further, in his review of the medical record, the ALJ found that the evidence concerning Claimant's bipolar disorder failed to establish the presence of the disorder for two (2) years where the symptoms resulted in more than minimal effects on Claimant's ability to perform basic work activities where the symptoms were presently stabilized by medication or psychosocial support, repeated episodes of decompensation, a fragile mental state where even simple changes could cause decompsensation, or one or more years' history or the current inability to function outside of a highly-supporting living arrangement. (R. 22). Finally, the ALJ assessed two state agency psychological evaluations which detailed, among other problems, Claimant's bipolar disorder. (R. 26, 414-31, 457-74). The ALJ used these evaluations to help determine what functional limitations Claimant suffered as a result of each of his mental disorders and the combined effect of all of Claimant's mental impairments. (R. 22-27). By considering Claimant's bipolar disorder in three different places in his decision, the ALJ showed clear consideration of the ailment and properly examined evidence concerning the disorder.

Claimant nonetheless argues that the ALJ should have considered the treatment notes compiled by Dr. Scott T. Schell in his consideration of Claimant's bipolar disorder. Pl.'s Mem. at 2; (R. 315-17). First, as discussed below, *infra* Section V.B., the ALJ's failure to discuss specific exhibits in this case does not constitute reversible error. Further, the notes identified by Claimant are not inconsistent with the findings of the ALJ and do not, as Claimant argues, demonstrate that Claimant's concentration, persistence, and pace are severely affected. The notes indicate that

11

Claimant suffers from bipolar disorder, resulting in general listlessness, anxiety, and decrease of sociability. (R. 315-17). The notes do not indicate that Claimant's concentration, persistence, are negatively affected and, contrary to Claimant's argument, state that "[t]here are no signs of hyperactive or attentional difficulties." (R. 317). Dr. Schell's notes, therefore, do not provide evidence suggesting that Claimant's bipolar disorder was more disabling than found by the ALJ and the failure to consider them does not warrant remand. Thus, the ALJ committed no error and properly considered Claimant's bipolar disorder.

## B.    The ALJ's Failure to Discuss Certain Pieces of Evidence.

Claimant argues secondly that the ALJ erred by failing to consider specific pieces of evidence which he contends support his claim for disability. Pl.'s Mem. at 2-6. This court disagrees with Claimant and finds that the ALJ committed no error in electing not to discuss certain pieces of evidence in his decision.

Contrary to Claimant's assertion, there is no requirement that the ALJ recite every piece of evidence in order for it to be determined that it was considered. *See Piney Mountain Coal Co. v. Mays*, 176 F.3d 753, 762, n.10 (4th Cir. 1999) ("If a reviewing court can discern 'what the ALJ did and why he did it,' the duty of explanation is satisfied") (quoting *Lane Hollow Coal Co. v. Dir., Office of Workers' Comp. Programs*, 137 F.3d 799, 803 (4th Cir. 1998)); *Brewer v. Astrue*, No. 7:07-CV-24-FL, 2008 WL 4682185, at *3 (E.D.N.C. Oct. 21, 2008) ("[T]he ALJ is not required to comment in the decision on every piece of evidence in the record and the ALJ's failure to discuss a specific piece of evidence is not an indication that the evidence was not considered.") (citing *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995)). Instead, where the ALJ extensively reviews the record in his decision, the ALJ shows that he or she properly considered all evidence in the record even

where he or she fails to specifically note each piece of evidence in the decision. *See Best v. Astrue*, No. 5:06-CV-301-D, 2008 WL 64687, at 8 (E.D.N.C. Jan. 3, 2008) ("[After noting] that he considered the entire record prior to making his determination. . .[the ALJ], in five single-spaced typed pages, . . . summarized the majority of Claimant's medical records as well as Claimant's testimony."); *Guthrie v. Colvin*, No. 4:13-CV-57-FL, 2014 WL 2575318, at \*6 (E.D.N.C. June 9, 2014) ("The extensive review of the medical evidence at step two indicates that the ALJ properly considered the entire record in making his determinations.").

Here, Claimant argues that the ALJ failed to consider a variety of different medical records detailing Claimant's impairments. Pl.'s Mem. at 2-6. In fact, however, the ALJ considered many of the exhibits that Claimant alleges he failed to address. *See* (R. 24-25) (ALJ addresses, among others, Exhibits 1F, 5F, 6F, 7F, 22F, and 23F, which Claimant alleges the ALJ failed to address). Further, to the extent that the ALJ did not mention specific records or statements from within these exhibits or specific exhibits as a whole, the failure to discuss that evidence is outweighed by the fact that he extensively reviewed Claimant's testimony and medical records in making his RFC assessment and credibility determination. *Best*, 2008 WL 64687, at \*8; *Guthrie*, 2014 WL 2575318, at \*6. The ALJ's opinion demonstrates that he considered the entire record in making his findings – the ALJ cites to a variety of evidence from the record covering the period in question, including treatment notes from Claimant's physicians, medical opinions from those physicians and from state agency physicians, Claimant's testimony, and third-party evidence offered by non-medical witnesses. (R. 23-27). His failure to cite to the specific pieces of evidence identified by Claimant is not an indication that those exhibits were not considered. *Brewer*, 2008 WL 4682185, at \*3. Therefore, the ALJ committed no error in failing to specifically mention each piece of evidence in the record.

13

**C.     The ALJ's Consideration of Claimant's Noncompliance**.

Third, Claimant argues that the ALJ impermissibly used Claimant's noncompliance with recommended treatment to weigh against his credibility. Pl.'s Mem. at 2. Claimant contends that his failure to adhere to the recommended course of treatment was due to his lack of insurance and general inability to pay for recommended treatments. *Id.* The undersigned disagrees with Claimant's characterization of the ALJ's findings and instead finds that the ALJ did not make an improper consideration in assessing Claimant's credibility.

The claimant's inability to pay for prescribed treatment which he would otherwise have pursued is a "justifiable cause" for failing to follow that treatment. SSR 82-59, 1982 WL 31384, at *4 (Jan. 1, 1982). However, "[i]t flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him. *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984). Thus, considering a claimant's failure to pursue treatment or to comply with recommendations as part of the credibility analysis where the claimant could not afford to pursue the options recommended to him is an error warranting remand. *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) (citing *Preston v. Heckler*, 769 F.2d 988 (4th Cir. 1985)).

Here, the ALJ mentioned Claimant's failure to pursue treatment in two different locations in his opinion. First, the ALJ mentioned a gap in Claimant's treatment records between the date of onset, in December 2008, and the next medical statement in the record, from December 2009. (R. 24). That particular reference to the gap in Claimant's treatment history does not appear to be a consideration in the ALJ's credibility analysis. Rather, the ALJ in this instance was merely clarifying the reason for the gap in his chronological review of Claimant's medical records. *Id.*

14

The ALJ next refers to the significant gaps in treatment for Claimant's physical and mental impairments while assessing Claimant's credibility. (R. 27). Claimant's testimony, however, fails to provide a direct link between this gap and his financial situation. *See Gordon*, 725 F.2d at 237 (Claimant provided undisputed testimony that had he been able to afford the cataract surgery at issue, he would have done so); *Lovejoy*, 790 F.2d at 1117 (Claimant testified that after losing her job and paying out of pocket for one surgery, she simply lacked the funds to pursue further treatment options). In this case, Claimant twice testified that financial issues were the reason that recommended treatment was not pursued. First, Claimant stated that he could not afford to pursue recommended back surgery because, after losing his job and insurance coverage, he lacked the means to pay for such surgery. (R. 80). It is clear from the ALJ's opinion, however, that the ALJ did not weigh Claimant's failure to pursue back surgery against him in weighing his credibility, only large gaps in the treatment record. The ALJ never noted Claimant's failure to seek back surgery in sections discussing Claimant's history with back ailments (R. 24-25) and only referred to Claimant's complete failure to seek treatment for any of his ailments over a three year period in his credibility assessment (R. 24, 27).

Next, Claimant mentioned his inability to afford recommended follow-up inhaling treatments for his sarcoidosis. (R. 81). The explanation offered by Claimant, however, fails to explain the complete gap in any medical treatment between November 13, 2008, *see* (R. 399) (Claimant visits Dr. Meisha Abbasinejad at Cape Fear Physical Medicine and Rehabilitation Associates), and a series of consultative and DDS assessments conducted in November and December 2009 (R. 403-05 (consultative examination performed by Dr. Atul Kantesaria conducted November 14, 2009), 409-13 (examination conducted by Dr. Alan Cohen dated December 1, 2009), 414-39 (psychiatric review,

15

mental RFC, and physical RFC assessments performed by DDS physicians from December 2-4, 2009)). Claimant did not resume any treatment for any of his impairments until October 2011, almost a three-year gap between any form of treatment for any of his conditions. (R. 519-22 (Claimant visits Sandhills Medical Care Center for a "wellness and physical evaluation")). In sum, Claimant's testimony that he could not afford one form of treatment for one of his ailments does not adequately explain his complete failure to seek any treatment for any of his impairments for nearly three years. Therefore, the ALJ committed no error in considering Claimant's lack of treatment for all of his impairments for large gaps during the relevant period.

**D.      The ALJ's Failure to Fully Consider Statements of the Third-Party Witness.**

Claimant next argues that the ALJ erred by failing to fully consider the limitations identified by third-party lay witness Keona L. Barnes. Pl.'s Mem. at 4; (R. 244). Ms. Barnes, a certified nursing assistant and missionary who assists Claimant with household needs and running errands, described swelling in Claimant's feet and ankles, unpredictable mood swings, extreme nervousness in public, and Claimant's occasional inability to leave bed for an entire day because of pain and depression. (R. 244). The ALJ considered Ms. Barnes' statement and noted some of Claimant's symptoms that she reported observing. (R. 27). Again, contrary to Claimant's argument, the ALJ was not required to recite each symptom that Ms. Barnes described in her statement. *Brewer*, 2008 WL 4682185, at \*3. Further, to the extent that Claimant argues that the ALJ should have read Ms. Barnes' statement as evidence that Claimant is incapable of performing even sedentary work, Claimant asks the court to re-weigh the evidence and substitute alternative conclusions for those made by the ALJ, which the reviewing court is not permitted to do. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Therefore, the ALJ's consideration of Ms. Barnes' statement in this case is

16

not grounds for remand.

**E.     The ALJ's Consideration of the Pre-Onset Effects of Claimant's Obesity.**

Claimant next contends that the ALJ erroneously considered the effects of his obesity before the alleged onset of Claimant's disability. Pl.'s Mem. at 5. The ALJ noted that Claimant went hiking while at an obese body weight as late as 2006 in determining that Claimant's obesity was not disabling by itself or that it aggravated Claimant's other impairments to the point that work activity would be precluded. (R. 24, 78). The ALJ must consider the entire case record and provide specific reasons based upon the relevant evidence in the record when making a credibility determination. SSR 96-7p, 1996 WL 374186, at \*4 (July 2, 1996); *Ketcher v. Apfel*, 68 F. Supp. 2d 629, 652 (D. Md. 1999). Where evidence predating the onset of disability is relevant to an issue in the case, the ALJ should consider that evidence in making a determination on the issue. *Corcoran v. Astrue*, Civ. No. SKG-08-913, 2009 WL 3100350, at \*13 (D. Md. Sept. 22, 2009) (ALJ's consideration of plaintiff's psychiatric evaluations which took place before the alleged onset was not error) (citing *Carpenter v. Astrue,* 537 F.3d 1264, 2008 WL 3892065, at \*2 (10th Cir. 2008) (holding that the ALJ's failure to consider medical evidence predating the claimant's alleged onset of disability was reversible error) and *Vandenboom v. Barnhart,* 421 F.3d 745, 750 (8th Cir. 2005) ("there is no valid reason to exclude consideration of medical records dated prior to [the claimant's] alleged date of onset")); *Woodhouse ex rel. Taylor v. Astrue*, 696 F. Supp.2d 521, 535 n.14 (D. Md. 2010) (holding that a behavior evaluation was still relevant evidence and must be considered by the ALJ although it took place before plaintiff's alleged disability onset); *Peters v. Astrue*, No. 6:10-cv-00941, 2011 WL 3876921, at \*5 (D. S.C. Sept. 1, 2011) ("The fact that Dr. Koon's medical opinion was rendered before the alleged onset date does not render the medical evidence irrelevant."). Claimant's

17

testimony about hiking shows that despite being obese, he was able to engage in strenuous activity and was not unduly limited when obesity was his only impairment. Since the evidence was relevant to determining Claimant's credibility and the extent of his limitations, the ALJ did not err in considering it.

**F.    Improper Consideration of Medical Opinion Evidence.**

Claimant's sixth assignment of error is that the ALJ failed to properly consider the medical opinion evidence. Pl.'s Mem. at 5-6. Claimant appears to make three specific arguments pertaining to improper consideration of the opinions. First, Claimant contends that because the ALJ assigned "little weight" to Dr. Kantesaria's opinions, prepared on November 12, 2009 and July 13, 2010, the evidence should be completely disregarded. Pl.'s Mem. at 5-6; (R. 25-26, 403-05, 447-49). Second, Claimant argues the opinions prepared by two state agency psychological consultants weighed in favor of finding that Claimant was unable to perform even sedentary work. Pl.'s Mem. at 6. Third, Claimant argues that the ALJ's failure to state the weight given to the physical RFC evaluation prepared by DDS Physician Dr. Pamela Jessup on December 4, 2009 constitutes reversible error. *Id.* The undersigned finds that none of these three arguments merits remand in this case.

First, the ALJ's decision to assign "little weight" to the opinions prepared by Dr. Kantesaria does not require him to completely disregard the evidence. Regardless of the source, the ALJ must evaluate all medical opinions received. 20 C.F.R. §§ 404.1527(c), 416.927(c). Unless the ALJ assigns controlling weight to an opinion prepared by a treating source physician, he is required to analyze all medical opinions in the record and state the weight assigned to each of them. *Id.* §§ 404.1527, 416.927; *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). Here, there was no treating physician opinion in the record so the ALJ was obligated to analyze and state the weight

18

assigned to each medical opinion in the record, including those to which he ended up assigning "little weight." Therefore, the ALJ's consideration and discussion of Dr. Kantesaria's opinion was appropriate and compelled by the regulations.

Second, Claimant's argument that the opinions prepared by two state agency psychological consultants actually weigh in favor of a finding of complete disability rather than a finding that Claimant could perform sedentary work is without merit. The ALJ assigned each of these opinions "some weight" and restricted Claimant to only frequent contact with the public as a result of his consideration. (R. 26). Importantly, none of the opinions notes any more than "moderate limitations" in key functional areas, which is consistent with the ALJ's RFC findings. (R. 414-31, 457-74). While the DDS psychological consultants found that Claimant experienced "moderate difficulties" in activities of daily living, the only limitation that was more restrictive than those found by the ALJ, Claimant's testimony that he could go grocery shopping shows that he is able to perform some daily activities with only mild restrictions from his mental impairments. (R. 21, 73-74). Further, neither opinion states that Claimant is incapable of performing work tasks as a result of his mental limitations. Instead, each notes some specific limits on what stressors Claimant can handle and that Claimant should be limited to simple, routine tasks and a low-stress environment. (R. 430, 459). Those findings and conclusions are not inconsistent with the ability to perform the requirements of sedentary work and do not support the finding that Claimant is completely disabled. Therefore, the ALJ's consideration of the DDS psychological consultants' opinions was without error.

Finally, Claimant argues that the ALJ failed to state the weight assigned to the DDS physical RFC assessment completed by Dr. Pamela Jessup on December 4, 2009. Pl.'s Mem. at 6; (R. 432-

19

39). The ALJ, however, clearly stated that he gave Dr. Jessup's opinion significant weight. (R. 26) ("Both of these opinions were generally supported by and consistent with the clinical and diagnostic findings of record. Accordingly, the undersigned has given this [sic] opinions significant weight."). Since the ALJ stated the weight assigned to the opinion and discussed at length the consistency of the opinion with the evidence of record, *id.*, the undersigned finds no error as alleged by Claimant.

## G. Failure to Mention Medication Side-Effects in the Credibility Assessment.

Claimant's seventh argument is that the ALJ failed to consider the side effects of his medications when assessing his credibility. Pl.'s Mem. at 6. Claimant described the following side effects: increased appetite from various medications (R. 69-70), Abilify caused nausea and dry mouth, Depakote increased Claimant's shortness of breath (R. 71-72), and Valium made Claimant drowsy and sleepy (R. 72). Notably, Claimant also testified that the Depakote schedule was changed to avoid interference with other ailments and that he took Valium at night to help him sleep. (R. 71-72). "The ALJ is not required to accept unquestioningly all alleged side effects of medications; complaints of side effects may properly be discredited by inconsistent evidence." *Goodwater v. Barnhart*, 579 F. Supp. 2d 746, 759 (D.S.C. 2007) (citing *Johnson*, 434 F.3d at 659). Where such inconsistent evidence exists in the record, the failure to specifically mention side effects is harmless error. *Goodwater*, 579 F. Supp. 2d at 759. Here, the ALJ considered evidence suggesting that Claimant's obesity was a long-term problem and that despite being obese he had previously gone hiking with friends on a regular basis. (R. 24, 78). The nausea and dry mouth that Claimant attributes to taking Abilify do not indicate that he was any more functionally limited than the ALJ found him to be. (R. 71-72). Claimant testified that the schedule of Depakote was changed so that the problems with increased shortness of breath would be abated; he did not state that the problem

20

continued after that change was made. (R. 71-72). Last, Claimant noted that he took Valium at night to help him sleep, indicating that the medication side effects did not prevent him from performing sedentary work. (R. 72). Thus, substantial evidence in the record suggests that the side effects of Claimant's medications did not limit him past the extent found by the ALJ, making the ALJ's failure to mention these side effects harmless error. *Goodwater*, 579 F. Supp. 2d at 759.

## H.    Improper Reliance on VE Testimony.

Claimant's final assignment of error is to the ALJ's failure to note the VE's response to the final hypothetical question asked by the ALJ. Pl.'s Mem. at 6. Specifically, Claimant contends that the ALJ's step five finding that he could perform other work is not supported by substantial evidence because the VE testified that if all of the ailments described by Claimant were true, there would be no competitive work that Claimant could perform. *Id.* Claimant's final argument is meritless.

The ALJ found, after a thorough review of the medical record, that Claimant is not as impaired as he claims. (R. 22-27). The ALJ also framed the first hypothetical question around the RFC he determined based upon that review of the evidence. (R. 22-23, 84-85). The VE responded that, based upon that RFC, a hypothetical person with the same age, education, experience as Claimant would be able to perform at least three jobs: telephone information clerk (DOT # 237.367-046), lens inserter (DOT # 713.687-026), and plastic design applier (DOT # 690.686-046). (R. 86). Claimant does not challenge that the RFC is not based upon substantial evidence and the undersigned does not find any error with that assessment. The VE's testimony, therefore, is substantial evidence suggesting that Claimant would be able to find work despite the limitations found by the ALJ. The VE's answer to the second hypothetical does not affect that finding because the ALJ found Claimant not to be as limited as he testified. Thus, the ALJ's step five finding that jobs existed in significant

21

numbers in the local and national economies which Claimant could perform was not rendered erroneous by the VE's answer to the second hypothetical question.

## VI. CONCLUSION

For the reasons stated above, this court RECOMMENDS Claimant's Motion for Judgment on the Pleadings [DE-22] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE-27] be GRANTED and the final decision of the Commissioner be UPHELD.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days upon receipt to file written objections, and responses thereto (if any) shall be filed within seven (7) days of receipt of the objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

Submitted, this the 25th day of August 2014.

Robert B. Jones, Jr.
United States Magistrate Judge